UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CAROLYN A. GLEASON,

        Plaintiff,

      v.                    No.3:08-cv-1172-J-12JRK

ROCHE LABORATORIES, INC.,

        Defendant.

---

## O R D E R

    This cause is before the Court on Defendant's Dispositive Motion for Summary Judgment (Doc. 33), filed June 1, 2010. Plaintiff's response thereto (Doc. 36) was filed on June 18, 2010. On July 28, 2010, the Court conducted a hearing on the motion. On July 29, 2010, Defendant filed supplemental authority in support of its motion (Doc. 41) and Plaintiff filed an additional document in support of her response in opposition (Doc. 42). For the reasons set forth below, the Court will grant in part and deny in part Defendant's motion for summary judgment.

### Facts

    Plaintiff began working for Defendant in 1997. Doc. 2 at ¶ 9. The relevant events with regard to Plaintiff's employment began in June 2007,[1] when she was a medical center representative, marketing various drugs to medical centers and the physicians working there. It is undisputed that Defendant's business is highly regulated by the Food and Drug Administration ("FDA"), and that all employees receive extensive ongoing training regarding

---

[1]    Unless otherwise noted, the dates discussed hereafter occurred in 2007.

proper marketing of its products. Doc. 34-3 at 44, 56, and 152.

Plaintiff's supervisor, Division Sales Manager, Tom Long ("Long"), spoke to her about some overdue expense reports after he received a copy of an e-mail to Plaintiff dated June 12. Doc. 34-3 at Exh. 4. Plaintiff later submitted the expense reports and told Long it would not happen again. Doc. 34-3 at 80 and Exh. 5. She admits that throughout her tenure with Defendant, she had received numerous notices that her expense reports were overdue, but that "no one really cared" and she would simply submit them.[2] Docs. 34-3 at 75, 77, and 79; 36-4 at 75. She claims that she had never been given a specific time frame within which to submit an expense report by a supervisor until that summer. Doc. 36-4 at 75-76.

Plaintiff maintains that during this time period, she was being pressured by Long to obtain 100% conversion for her clients' use of the drug Mycamine in the 100mg dose as their formulary drug,[3] despite the fact that the drug had been on the market almost three years and did not yet have FDA approval or indication for some uses that competing drugs had obtained. Docs. 34-3 at 110 and 112-13; 36-4 at 108-9. She claims that as a result, she had done everything she legally could do to increase her sales, but that without the FDA indication for certain uses, the only way to meet her sales goals set by Long would

---

[2] In 2004, Plaintiff was disciplined for her handling of drug samples, and received notices about that issue again in June and August 2007. Doc. 34-3 at Exhs. 9-14. However, there is no indication in the record that this issue played any role in the decision to terminate her and accordingly is irrelevant for establishing a legitimate business reason for her termination.

[3] A formulary drug is the preferred drug that is prescribed automatically for a given indication.

2

have been to improperly market the drug for off-label uses, that is, to directly promote Mycamine for uses or indications which the FDA had not yet approved. Doc. 34-3 at 63. Plaintiff felt Long was pressuring or harassing her to do this to increase her sales. Id. She asserts that when she voiced these complaints to Long in the context of discussions about her sales performance, Long told her she still had to get the drug on formulary and to sell it. Doc. 34-3 at 114-18.

Long's supervisor, Regional Sales Director, William Sweeney ("Sweeney") and Long both acknowledge that certain off-label promotion is illegal. Docs. 36-1 at 14-15; 36-2 at 17, 25-26, 42 and 132-33. Defendant's internal policies recognize that sales representatives are prohibited from discussing or distributing certain promotional materials related to off-label uses with potential customers and are severely limited in their ability to use certain FDA approved materials regarding off-label uses. Doc. 34-4 at Exh. 21.

Plaintiff admits that she was never directly told to promote Mycamine illegally for off-label use by Long, and that in fact, human resources representatives affirmatively told her that she was not expected to use illegal means to increase her sales, but maintains that Long's insistence that she get the drug on formulary with all her clients and that she needed to "get the information out there to them" would have left no other option as she had exhausted all legal means to increase her sales. Doc. 34-3 at 118, 126-28, and 153. She claims Long provided her with articles that she was expected to be able to discuss with physicians, but it would have been illegal for her to do so. Doc. 34-3 at 118 and 160-61.

Elizabeth Gray ("Gray"), another medical center representative who reported to Long, indicated that she also felt pressure to increase her sales numbers by promoting Mycamine illegally. Doc. 36-7 at 33. She stated that despite the fact that hospitals in her

3

sales territory would not consider using Mycamine as their formulary drug without an FDA indication, she was put on a performance improvement plan because of her low Mycamine sales. Id. at 34.

On June 13, Plaintiff gave a presentation about Mycamine to a potential customer. Long attended that presentation, gave her a negative review about her presentation skills afterward, and began requiring her to report to him weekly about her agenda, goals and progress for the sale of Mycamine. Docs. 34-3 at 146; 36-4 at Exh. 27. Plaintiff asserts that during that presentation, Long provided non-FDA approved information about off-label uses of Mycamine, both verbally and in the written form of an article, to a physician, and that she complained afterwards that he was "over the line" and that she would "not operate illegally." Docs. 36-4 at 104-106 and Exh. 22; 36-4 at 168-72. Plaintiff claims that Long previously had given her superior performance reviews and this negative review came after she had refused to utilize the inappropriate written information and objected to doing anything illegal. Doc. 36-4 at 104 and 168-71. Long testified that if an article was not one that had been approved for distribution, he would not distribute it, and in any event did not use articles in front of customers. Doc. 36-2 at 63.

On June 27, Long participated in a conference call with Sweeney and Kristine Koptchev ("Koptchev")[4], a human resources manager, to discuss issues with Plaintiff's and Gray's job performances. Concerns noted regarding Plaintiff included that she was not in the field enough, stumbled with documents, could not close big accounts, whether the will

---

[4]      After Plaintiff was terminated, the last name of Kristine Koptchev changed to Kratschmer. Though some of the documents submitted refer to her as Kristine Kratschmer, for purposes of this Order, the Court will refer to her as Kristine Koptchev.

4

to succeed is there or not, and being at the bottom of sales with Gray. Doc. 34-5 at Exh. 1. The decision resulting from that meeting was to monitor Plaintiff's progress for two months, perhaps leading to a performance improvement plan after midyear evaluations. Id.

Plaintiff and another employee, Melissa Balogh ("Balogh"), had scheduled a drug presentation to potential clients in Gainesville, Florida, for July 20. Shortly before the presentation, Balogh agreed or volunteered to cover it rather than cancel it, so Plaintiff could make a presentation on Mycamine elsewhere. Doc. 34-3 at 211-13. Plaintiff agreed to cover the expenses for the presentation because she had already budgeted and paid for it and Balogh could not cover the expense from her budget, so that Defendant could have the benefit of both drug presentations. Id.

After the July 20 Gainesville drug presentation, Balogh contacted her supervisor, Karen Eubanks ("Eubanks"), claiming that she was uncomfortable because Plaintiff had contacted her and asked her not to let Eubanks know that Plaintiff was not present at the Gainesville presentation. Doc. 34-2 at 21. Balogh stated that Plaintiff specifically told her not to lie but also told her to not say anything to Eubanks to indicate she had not been there. Id. Eubanks memorialized her conversation with Balogh in an e-mail copied to Long and Sweeney dated July 27. Doc. 34-5 at Exh. 4. Plaintiff denies telling anyone that she was present at the Gainesville presentation or asking Balogh not to disclose that she did not attend. Doc. 34-3 at 213 and 219.

On August 6 and 13, Plaintiff and Long again received notices that Plaintiff was overdue to submit some expense reports. Doc. 34-3 at Exhs. 6 and 7. On August 12, Plaintiff electronically submitted expense report #299 which included food and mileage

5

expenses for the July 20 presentation in Gainesville. Doc. 34-4 at Exh. 34. Plaintiff claims that upon completion of her presentation she went through Gainesville on that date to check on how Balogh's presentation had gone, but that it was over when she arrived. Doc. 34-3 at 217. Her expense report #300 claims expenses, but not mileage, for the same day in Orange Park. Doc. 34-3 at Exh. 38. On August 30, Long contacted Koptchev to discuss Plaintiff's expense reports and to discuss possible disciplinary action. Docs. 33-1 at ¶ 4 and 34-3 at Exh. 6. Koptchev's notes from that meeting indicate that they discussed Plaintiff's expense reports being consistently late and the probability that she would be placed on a performance improvement plan in September. Doc. 42. Plaintiff submitted supporting documentation for the reported expenses on September 4.

Plaintiff's sexual harassment complaint arose from an alleged incident that occurred at a company sales meeting in Las Vegas in September. She asserts that on September 7, a Friday, Long hugged her twice, kissed her ear, and whispered in her ear that he would call her, and that she took it as a sexual advance because it was "opposite" from his recent behavior towards her. Doc. 34-3 at 174-75. Long recalled hugging Plaintiff and others at the end of the meeting, something he claimed was not unusual, but denied kissing her or whispering in her ear. Doc. 36-2 at 40. Another employee who attended the meeting, Gary Allen ("Allen"), recalled hugging someone and seeing Long hug Plaintiff, and stated it was not unusual to hug goodbye at the end of a meeting. Doc. 34-1 at 79 and 83. Long advised Koptchev that sometime during the course of the week-long Las Vegas meeting, he told Plaintiff that human resources was "aware of her expenses" and that Plaintiff became upset and left. Doc. 34-5 at 56.

On Monday, September 10, Plaintiff left several phone messages and sent an e-

6

mail to human resources asking to discuss "an escalating problem with [her] manager."
Doc. 34-3 at 234 and Exh. 28. In her e-mail, she referred to "multiple issues that had
occurred over the past months and two weeks" and to the alleged incident with Long on
September 7 at the Las Vegas meeting as the "most unsettling." In response to her
complaint to human resources, she describes speaking with both Michele Crocco[5] on
September 10 and Koptchev on September 14 about numerous issues regarding Long's
behavior, including: 1) Long's pressuring her to sell and harassing her to do reports and
calls that others did not have to do even though she was not at the bottom of sales on
Long's sales team; 2) how she had done all she could do legally and was being pressured
to do more to make sales happen to get 100% conversion of her clients to Mycamine
despite its lack of FDA indication for certain uses; 3) that she was not given further
direction as to legal means to do so; and 4) that she was unable to get Long to schedule
her mid-year performance review, although other team members' reviews had been
scheduled, or to find out whether she would be put on a performance review plan. Doc.
34-3 at 124-28, 161 and 181-82. After discussing her various complaints about Long and
the pressure to increase her sales of Mycamine, she testified that she told Koptchev "no
matter what sales I got, it still was not enough, and then, I go to a meeting and am being
professional and I get pulled into a hug, not once, but twice. With this kind of behavior
Tom Long didn't need to put his lips in my ear." Doc. 34-3 at 182. She also indicated that
she viewed all her complaints about Long, including the alleged incident of sexual
harassment, "as one complaint" or "all part of the same thing." Doc. 34-3 at 185.

---

[5]     Michele Crocco is incorrectly identified in the deposition transcript of
Plaintiff as Michele Kroker.

Meanwhile, having received the supporting documentation for Plaintiff's expense reports, Long, Sweeney, and Koptchev participated in a conference call to discuss them on September 12. Docs. 33-1 at ¶ 6; 36-5 at 26-27. They discussed Balogh's allegation that Plaintiff had asked her to lie about Plaintiff's attendance at the July 20 Gainesville presentation and possible falsification of her expense report #299 regarding that presentation, agreed that an investigation was warranted, and that Long would meet with Plaintiff to gain clarification. Id. at ¶¶ 7-8 and Doc. 36-5 at Exh. 5.

Koptchev knew about Plaintiff's complaint to human resources, but had not yet spoken with Plaintiff, and intentionally did not mention Plaintiff's complaints about alleged sexual harassment or other complaints concerning Long at that September 12 meeting. Docs. 33-1 at ¶ 6; 36-5 at 29-30. Koptchev's notes reflect various options they considered to address Plaintiff's possible falsification of expense report #299 and alleged request that Balogh not tell her supervisor that Plaintiff had not been at the presentation. Doc. 36-5 at Exh. 5. Possible termination was not one of the options considered. Plaintiff believes that Long was aware of her September 10 complaints against him at the September 12 meeting because shortly after she lodged her complaints, after approving two pending expense reports, he stopped approving her remaining pending expense reports, contrary to his usual practice of approving all her pending expense reports in a single batch. Doc. 36-4 at 232, 235 and 270.

On September 14, Koptchev interviewed Plaintiff about her complaints regarding Long's behavior at the Las Vegas meeting, and his alleged harassment for her to turn in her expense reports on time and increase her sales of Mycamine. Id. at 9. Contrary to Plaintiff's account of the conversation, Koptchev's notes do not reflect any discussion

8

regarding Plaintiff feeling pressure to sell Mycamine off-label.  Doc. 36-5 at Exh 7.

On September 17, Plaintiff met Long at the Jacksonville, Florida airport to review her expense reports.  Doc. 34-3 at 245.  Long reported to Koptchev that during that meeting Plaintiff affirmatively stated she had attended the July 20 presentation in Gainesville.  Doc. 33-1 at ¶ 10. Plaintiff denies that Long asked her whether she actually attended the presentation, and maintains he merely went over the various expenses asking her to explain to him what they were and if she had the required sign in sheets for certain expenses.  Docs. 34-3 at 246; 36-4 at 247-48 and 252; 36-6 at 96.  She claims that had he asked, she would not have had a problem saying she had not attended because it was a common practice.  Doc. 36-4 at 249.  Plaintiff's understanding was that as long as a qualified employee gave the presentation, there was no requirement that she actually be present, and that claiming the expense she actually incurred was not an uncommon practice, and, at most was only a minor technical violation of Defendant's policies.[6]  Doc. 36-4 at 49.  Long, however, understands the Defendant's policy to be that if an expense for a presentation is submitted, the employee was required to be present.  Doc. 36-2 at 28.  Long verified with Eubanks that Plaintiff did not attend the July 20 presentation in Gainesville on September 20.  Doc. 34-2 at 26.

On September 25, Koptchev discussed Plaintiff's complaints with Long, including

_____

[6]     Plaintiff also points to several other employees who committed what she contends were more significant violations, such as improper use of the company credit card and falsifying required presentation attendance logs, and who were not terminated as a result. Doc. 36 at 10-11. Defendant maintains that they are not appropriate comparisons for use in establishing retaliation because those employees admitted their wrongdoing and Plaintiff did not. As discussed herein, Plaintiff denies telling Long or anyone that she attended the Gainesville presentation, so an issue of fact exists.

the allegation of sexual harassment. Doc. 33-1 at ¶ 11. The first two items reflected in her notes were discussions about incidents in April, where Long denied yelling at Plaintiff, and in June, where during a conversation about her expenses, Long denied yelling at her, but indicated he had been very stern with her regarding the ongoing issue and that Plaintiff did not "acknowledge her tardiness in expenses." Doc. 34-5 at Exh. 11. Her notes reflect that Long denied kissing her, and stated that he may have given her and many people a hug at the end of the meeting, and "that's the way we are in the south." Docs. 33-1 at ¶ 11; 34-5 at 56-57 and Exh. 11. Koptchev's notes of that interview do not reflect any discussion with Long of Plaintiff's alleged complaints to human resources that she was being pressured by Long to sell Mycamine off-label. Doc. 36-5 at Exh 7. That same day, after Koptchev conferred with others in human resources, she determined that there was insufficient evidence to go forward with Plaintiff's claim of sexual harassment and notified Plaintiff of that decision. Docs. 33-1 at ¶ 13-14; 34-5 at Exh. 11.

Plaintiff was terminated on September 27. Id. at ¶ 16. The record is unclear as to who made the decision to terminate Plaintiff. Koptchev's handwritten notes dated September 25, the same date she interviewed Long about Plaintiff's complaints to human resources, indicate that the decision to terminate was made by "all." Doc. 36-5 at Exh. 9. When asked who "all" were, Koptchev states that "the business," that is Long and Sweeney, made the decision based on her recommendation, because Plaintiff falsified her expense report, asked a co-worker to lie for her, and lied when confronted with the issue. Docs. 33-1 at ¶ 15; 36-5 at 47-48. Her handwritten notes indicate that falsification of expense reports was the reason for termination. Doc. 36-5 at Exh. 9. She states that Plaintiff's complaints to human resources were not mentioned during the discussion. Docs.

10

33-1 at ¶ 15; 36-5 at 47-48 and 51.  Long denies making the decision and claims that he "provided information about what was going on and the issues at hand."  Doc. 36-2 at 112-13.  Sweeney stated that Koptchev made a strong recommendation to terminate Plaintiff which he took to be a clear direction and a decision that would have been very difficult to override.  Doc. 36-1 at 58-59 and 63.

## Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The purpose of summary judgment is to dispose of unsupported claims or defenses which, as a matter of law, do not raise issues of material fact suitable for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether the movant is entitled to summary judgment, the Court must view all the evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party, and must resolve all reasonable doubts in favor of the non-movant.  See, e.g., Rioux v. City of Atlanta, Georgia, 520 F.3d 1269, 1274 (11th Cir. 2008)(citations omitted).

## Analysis Under Applicable Law

Plaintiff claims that she was terminated from her job as a medical center drug representative on September 27, in violation of the Florida Private Sector Whistleblower Act ("FWA"), Fla. Stat. §§ 448.101, et seq.(Count I), and the Florida Civil Rights Act

("FCRA"), Fla. Stat. §§ 760.01, et seq.(Count II), in retaliation for refusing to promote off-label uses of the drug Mycamine or to communicate false or misleading information about the drug in violation of federal law, and for complaining of illegal sexual harassment.[7] See Doc. 2 at ¶¶ 1 and 48.  Defendant maintains that it terminated Plaintiff for legitimate business reasons related to her poor job performance, specifically her alleged falsification of expense report #299 for the July 20 presentation, her alleged request that Balogh lie to her supervisor to indicate Plaintiff did attend the presentation, and allegedly lying to Long by affirmatively stating she had attended the presentation.

Both parties agree that Plaintiff's retaliatory discharge claims under both the FWA and the FCRA are analyzed in the same familiar manner as retaliation claims under Title VII of the Federal Civil Rights Act.  That is, Plaintiff first must establish a prima facie case of retaliatory discharge, then the burden shifts to Defendant to establish a legitimate business reason for her discharge, and if it does so, Plaintiff then bears the burden of establishing that the proffered reason was pretextual.  See Docs. 33 at 17and 19; 36 at 3,10, 14 and 18.

### Plaintiff's FWA Claim

Under the FWA, in order to establish a prima facie case, Plaintiff must show 1) that she objected to or refused to participate in any illegal activity, policy or practice of Defendant; 2) she suffered an adverse employment action; and 3) the adverse

---

[7]     Count I of Plaintiff's Complaint asserts that Defendant's alleged retaliation for her refusal to promote off-label uses of the drug Mycamine or to communicate false or misleading information about the drug, and for her complaint of alleged illegal sexual harassment, both violated the FWA. Count II under the FCRA addresses only Defendant's alleged retaliation for her complaint of sexual harassment.

employment action was causally linked to her objection or refusal.  See Fla.Stat. §448.102(3); Bell v. Ga.-Pac. Corp., 390 F.Supp.2d 1182, 1187 (M.D.Fla. 2005).  In order to overcome Defendant's proffered legitimate business reasons for termination, Plaintiff must provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for discharge.  Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997), cert. denied, 522 U.S. 1045 (1998).

Plaintiff claims Long pressured or harassed her to provide information to potential customers about off-label uses of Mycamine that she was legally prohibited from providing, in order to increase her sales and meet the goal of 100% conversion of her clients' use as their formulary drug.  She maintains that she complained to Long and to human resources (Crocco and Koptchev) about the pressure she was receiving to increase her sales despite the lack of FDA indication for certain uses, and was told simply that she had to increase her sales while being given no direction as what legal means she could use that she had not already employed.

She also claims that she witnessed her supervisor provide orally and in writing such information to potential customers during her presentation on June 13, and that she told him that he was over the line and that she would not do anything illegal. Although the record reveals that Long discussed with Koptchev various issues related to her late expense reports in June, and her expense report #299 for the July 20 presentation in Gainesville, it does not appear that the alleged falsification of report #299 was a focus of their discussions until September 12, after Plaintiff lodged her complaints with human resources on September 10 about the pressure or harassment she was feeling to increase sales and the alleged incident of sexual harassment at the Las Vegas meeting earlier in

13

September, or that termination of her employment was a disciplinary measure considered by anyone until after Koptchev interviewed Long on September 25 about Plaintiff's alleged complaints. Plaintiff was fired two days later, on September 27.

Moreover, neither Long, Sweeney, or Koptchev admit to having made the decision to terminate her. As noted above, Long denied making the decision, Sweeney claims human resources made the decision, and Koptchev asserts "the business," that is Long and Sweeney made the decision.

The Court is of the opinion that Plaintiff has presented sufficient evidence to establish a prima facie case that she was terminated for objecting to or refusing to participate in illegal off-label promotion of Mycamine and to raise questions of fact regarding whether Defendant's proffered reasons for terminating her were pretextual.[8] As an initial matter, as noted above, numerous issues of disputed material facts exist in this case, which require credibility determinations, including: 1) whether at her June, 13 presentation, Long improperly presented information to potential customers about off-label uses of Mycamine and whether Plaintiff raised the issue of illegality with him; 2) whether Plaintiff asked Balogh to not reveal that Plaintiff had not attended the July 20 presentation in Gainesville, and to what extent not attending the presentation or claiming the actual expense without having attended the presentation was a serious violation of Defendant's policies; 3) whether Plaintiff told Long she had attended the July 20 presentation at the meeting with Long on September 17 during the review of her expense reports; 5) whether

---

[8]     Because the analyses under the FWA and FCRA are the same, the Court will address Plaintiff's claim that she was terminated for complaining of sexual harassment in violation of the FWA below in the section discussing her FCRA claim.

Plaintiff complained to Long and human resources specifically about pressure to sell Mycamine illegally; and 6) who made the decision to discharge her.

The Court must view these and other disputed facts in the light most favorable to Plaintiff. Viewing them accordingly, and taking into account the fact that termination does not appear to have been considered as an option to deal with the issues concerning Plaintiff's employment performance until after Koptchev interviewed Long on September 25, regarding Plaintiff's complaints, the Court cannot find as a matter of law that Defendant is entitled to summary judgment on Plaintiff's FWA claim as it relates to her alleged complaints about alleged pressure to promote Mycamine illegally. Defendant's motion for summary judgment therefore must be denied as to that portion of Plaintiff's FWA claim in Count I.

### Plaintiff's FCRA and FWA Claims Regarding Sexual Harassment

In order to establish a prima facie case under the FCRA, Plaintiff must establish that she had a reasonable, good faith belief at Defendant was engaged in sexual harassment, that she suffered an adverse employment determination, and a causal relationship between the two. See Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002). Plaintiff must not only show that she subjectively, in good faith, believed Defendant was engaged in unlawful sexual harassment, but that her belief was objectively reasonable in light of the facts presented in the record. Id. at 1312. As discussed above, to establish a prima facie case under the FWA with regard to her complaint of sexual harassment, Plaintiff must show that she objected to conduct that would constitute illegal sexual harassment.

The Court agrees with Defendant that the record does not demonstrate that Plaintiff

subjectively believed that the single incident at the Las Vegas meeting that she complained of constituted illegal sexual harassment, or in any event, that such belief would be objectively reasonable. Plaintiff complained to human resources of the single incident in the context of complaining about "an escalating problem with [her] manager" and "multiple issues that had occurred over the past months and two weeks." While she did indicate in her e-mail to human resources that Long's alleged behavior on September 7 at the Las Vegas meeting was "the most unsettling," the focus of her complaints during her discussions with human resources representatives is clearly the numerous ways she believed Long was inappropriately pressuring or harassing her to submit her expense reports in a timely fashion and increase her sales of Mycamine. While she states in a conclusory affirmative response during her deposition that she believed Long's behavior was a sexual advance, when she described what she told Koptchev she stated, "no matter what sales I got, it still was not enough, and then, I go to a meeting and am being professional and I get pulled into a hug, not once, but twice. With this kind of behavior Tom Long didn't need to put his lips in my ear." Plaintiff obviously was upset by Long's alleged behavior on September 7, but "this kind of behavior" appears to be the focus of her complaints and to refer to the numerous other behaviors Plaintiff was upset by.

Moreover, she stated that she believed the alleged sexual harassment and alleged harassment to sell Mycamine off-label to be "one complaint" and "all part of the same thing." In addition, Plaintiff has offered no evidence to dispute the testimony of Long and Allen that Long also hugged others after the meeting and that hugging goodbye at the end of a meeting was not an unusual practice.

Plaintiff has offered two facts to provide context to support the subjective and

16

objective reasonableness of her belief that Long's alleged behavior constituted illegal sexual harassment: 1) that before Long was her supervisor, it was known he was having a long term affair with her supervisor at that time; and 2) that during the time Long was her supervisor she witnessed Long making and allowing males to make "inappropriate comments." Doc. 36-6 at ¶¶ 4-5.  She identifies the inappropriate comments by Long as "frequent comments regarding his ex-wife as well as generalizations toward women not knowing what they want, not being satisfied, and being unable to make their own decisions."  Id. At ¶5.  She claims he allowed males to make frequent comments "with regard to homosexual women and their personal sexual choices."  Id.

The Court cannot find that these facts, even if true, provide sufficient context of a sexually hostile environment to render her assertion that she believed Long's alleged conduct to constitute an illegal sexual advance toward her subjectively or objectively reasonable in light of the record before the Court.  Cf.  Robinson v. Jacksonville Shipyards, 760 F.Supp. 1486 (M.D.Fla. 1988).  The alleged sexual harassment was a single incident that occurred in the context of Long hugging her and others at a meeting which was not an unusual practice.  The "inappropriate comments" Plaintiff identifies may be characterized as demeaning or derogatory concerning women, but they are not of the type of comments that support an inference that whatever occurred between Plaintiff and Long had sexual significance.  Most importantly, Plaintiff herself saw all of his alleged behavior towards her as "all part of the same thing" and the evidence is that when she complained about his behavior, her allegation of sexual harassment was a single item in a litany of non-sexual behaviors she considered "harassment."

The Court finds that the record demonstrates Plaintiff's belief that Long had illegally

sexually harassed her was neither subjectively, nor objectively reasonable, so she cannot establish a prima facie case under either the FWA or FCRA. As a result, the Court finds that Defendant is entitled to summary judgment on Plaintiff's claims that it violated the FWA and FCRA by discharging her in retaliation for her complaint of sexual harassment.

## Plaintiff's Damages

Defendant also argues that the record demonstrates that Plaintiff cannot establish entitlement to back pay because she has not made a reasonable effort to obtain comparable work and rejected unemployment benefits. Plaintiff claims that she did not seek comparable work in her field because it was widely known in the close-knit drug sales industry that she had been terminated for alleged fraud, and that at her age, it was highly unlikely that she would have been able to secure a comparable position. Doc. 36-6 at ¶¶ 9-11. She states that she decided to work in her husband's cabinet-making business without pay while taking courses to renew her nursing license. Doc. 34-3 at 260-263. She later decided to remain with the cabinet-making business on salary. Id.

The Court is of the opinion that questions regarding whether Plaintiff's efforts in obtaining employment were reasonable under the circumstances and the extent, if any, her claims for back pay should be eliminated or reduced as a result, are questions that should be determined by the finder of fact on the record in this case. Viewing the facts in the light most favorable to Plaintiff, the Court cannot find as a matter of law that Plaintiff is entitled to no award of back pay. Upon review of the matter, it is

### ORDERED AND ADJUDGED:

That Defendant's Dispositive Motion for Summary Judgment (Doc. 33) is granted in part and denied in part as follows: a) it is granted as to Plaintiff's FCRA claim in Count

18

II, and as to that portion of her FWA claim in Count I asserting that Defendant discharged her in retaliation for her complaint of sexual harassment; and b) is denied in all other respects as to her FWA claim in Count I.

**DONE AND ORDERED** this ___29th___ day of September 2010.

Howell W. Melton
**SENIOR UNITED STATES DISTRICT JUDGE**

c:     Counsel of Record